```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2       _____

 3       United States of America,    )  Criminal Action
                                       )  No. 1:21-cr-00235-RC
 4                        Plaintiff,   )
                                       )
 5       vs.                           )  Sentencing (via Zoom)
                                       )
 6       Richard Franklin Barnard and  )
         Jeffrey Shane Witcher,        )  Washington, D.C.
 7                                     )  February 4, 2022
                          Defendants.  )  Time:  2:30 p.m.
 8       _____

 9                   Transcript of Sentencing (via Zoom)
                                Held Before
10              The Honorable Rudolph Contreras (via Zoom)
                         United States District Judge
11       _____

12                       A P P E A R A N C E S

13       For the Government:      Brandon K. Regan
         (via Zoom)               UNITED STATES ATTORNEY'S OFFICE
14                                FOR THE DISTRICT OF COLUMBIA
                                  555 Fourth Street, Northwest
15                                Washington, D.C. 20001

16       For the Defendant Richard Franklin Barnard:
         (via Zoom)               Jesus M. Salinas, Jr.
17                                FEDERAL PUBLIC DEFENDER, TXW AUSTIN
                                  504 Lavaca Street, Suite 960
18                                Austin, Texas 78701-2860

19       For the Defendant Jeffrey Shane Witcher:
         (via Zoom)               Samuel Bassett
20                                MINTON, BASSETT, FLORES & CARSEY, P.C.
                                  1100 Guadalupe Street
21                                Austin, Texas 78701

22       Also Present (via Zoom):
                                  Aidee Gavito, U.S. Probation Officer
23

24

25
```

Stenographic Official Court Reporter:
(via Zoom)                 Nancy J. Meyer
                           Registered Diplomate Reporter
                           Certified Realtime Reporter
                           333 Constitution Avenue, Northwest
                           Washington, D.C. 20001
                           202-354-3118

1              P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3    limitations of technology associated with the use of
technology, including but not limited to telephone and video
4    signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5    reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7              THE COURTROOM DEPUTY:  This is Criminal Action

8    21-235, United States v. Richard Franklin Barnard and Jeffrey

9    Shane Witcher.  For the United States, I have Brandon Regan.

10   For Richard Barnard, I have Mr. Jesus Salinas.

11              MR. SALINAS:  Good afternoon.

12              THE COURTROOM DEPUTY:  For Jeffrey Witcher, I have

13   Samuel Bassett.  Our probation officer today is Aidee Gavito,

14   and our court reporter, again, is Nancy Meyer.

15         All parties are present.

16              THE COURT:  Good afternoon, everybody.

17              MR. BASSETT:  Good afternoon, Your Honor.

18              THE COURT:  Let's start with the colloquy for

19   proceeding by video rather than in person.

20         The Chief Judge in this district has authorized the use

21   of videoconferencing for sentencings because they cannot be

22   conducted in person without seriously jeopardizing public

23   health and safety.  We're prepared to proceed by

24   videoconferencing for this hearing today.  Do the parties

25   believe that proceedings today via videoconference rather than

1    waiting until a hearing can be held safely in person is in the

2    interests of justice?

3         Mr. Salinas?

4         MR. SALINAS:  Yes, Your Honor.

5         THE COURT:  Okay.  And why don't we make a short

6    record as to why it behooves everyone to proceed today by video

7    rather than waiting some indefinite period of time until COVID

8    disappears and we can all get together in person.

9         MR. SALINAS:  Sure, Your Honor.  Due to the rise in

10   numbers of infections of the COVID-19 virus, and including the

11   uptick in the Omicron virus, we believe it is in the best

12   interest for Mr. Barnard and the parties to proceed through

13   videoconference to avoid travel, to avoid the spread of

14   infection.  So we believe it is in the best interest to proceed

15   today rather than waiting an extended period of time.  We

16   believe the interests of justice fits the -- us proceeding

17   today.

18        THE COURT:  All right.  Mr. Bassett, I -- do you

19   agree with that?

20        MR. BASSETT:  I absolutely concur, Your Honor.

21        THE COURT:  Okay.  Mr. Regan?

22        MR. REGAN:  I do, Your Honor.

23        THE COURT:  All right.  Let's start with Mr. Barnard.

24   Mr. Barnard, do you agree after having consulted with your

25   counsel to participate in today's sentencing hearing using --

1          DEFENDANT BARNARD:  Yes, sir.

2          THE COURT:  -- videoconferencing rather than being

3    physically present in the courtroom?

4          MR. BARNARD:  Yes, sir, I do.

5          THE COURT:  All right.  Are you comfortable with the

6    videoconferencing equipment made available to you?

7          MR. BARNARD:  Yes, sir.

8          THE COURT:  And do you have an ability to consult

9    with your counsel in private, if necessary, during this

10   hearing?

11         MR. BARNARD:  Yes, sir.

12         THE COURT:  All right.  In addition to whatever you

13   may have set up with him, also the Zoom technology allows for

14   you to make a request to talk in private with your counsel, and

15   that my courtroom deputy can put you and him in a separate

16   virtual breakout room in which no one else can hear or see

17   what's going on.  So if at any point you want to have that sort

18   of private conversation with him during the hearing, just ask

19   and we'll go ahead and do that.

20         DEFENDANT BARNARD:  Thank you, sir.

21         THE COURT:  Okay.  Mr. Witcher, do you also consent?

22         DEFENDANT WITCHER:  I do, Your Honor.

23         THE COURT:  Okay.  And you're comfortable with the

24   videoconference equipment that you have available to you?

25         DEFENDANT WITCHER:  Yes, sir, I am.

1       THE COURT:  The Court finds that the use of the VTC

2   is necessary because it is not practical to appear in person

3   and proceeding by VTC today is justified because the interests

4   of justice will be harmed without a prompt hearing.  And the

5   defendants, after consultation with counsel, have consented to

6   proceeding in this fashion.

7       All right.  Do the parties have a preference as to what

8   order we go here?

9           MR. BASSETT:  Up to you, Your Honor.

10          THE COURT:  All right.

11          MR. SALINAS:  No preference, Your Honor.

12          THE COURT:  So let's start -- let's start with

13  Mr. Barnard then.

14      All right.  Mr. Barnard and Mr. Salinas, have you

15  reviewed the presentence report as revised following the

16  defense and the government's submissions?

17          MR. SALINAS:  We have, Your Honor.

18          THE COURT:  And any additional objections?

19          MR. SALINAS:  No additional objections, Your Honor.

20          THE COURT:  Okay.  Per the Federal Rule of Criminal

21  Procedure 32(i)(3)(A), the Court will accept the presentence

22  report as its findings of fact on issues not in dispute.

23      The defendant has pled guilty to a Class B misdemeanor

24  to which the sentencing guidelines do not apply.  Therefore, I

25  will assess and determine the proper sentence in this case by

1    reference to and in consideration of all the relevant factors

2    pursuant to the sentencing statute at 18 U.S.C. 3553(a).

3            The defendant has pled guilty to Count 5 of the

4    information; that is, parading, demonstrating, or picketing in

5    a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

6    The defendant has no criminal history.  The maximum term of

7    imprisonment for this offense is six months, and the maximum

8    fine is $5,000.

9            Would the government like to address the Court regarding

10   sentencing?

11           MR. REGAN:  It would, Your Honor.  And the government

12   intended on allocuting for both at the same time.  I don't know

13   if -- if the Court would prefer that for equity -- or for time

14   equity purposes.

15           THE COURT:  I'd just as soon do them separately

16   because one of them has guidelines and the other one doesn't,

17   and this one is going to be a little bit shorter.  We'll just

18   get this one out of the way and do the other, which raises -- I

19   mean, your question -- or your statement raises a good

20   question.

21           And clarify for me a little bit why these two defendants

22   that essentially did everything together were treated somewhat

23   differently as to what charge they pled to.  I don't have any

24   insight on that.

25           MR. REGAN:  Yes, Your Honor.  So in -- in this case,

1    the original indictment -- or the only indictment, Mr. Witcher

2    was charged with 1512(c)(2), which, as this Court knows, is a

3    felony, based on some of his conduct inside the building, and

4    Mr. Barnard was not.  Mr. Barnard was charged solely with

5    misdemeanors throughout the pendency of this case, which is why

6    in terms of plea -- the plea scheme that the government has.

7         Because Mr. Witcher was given the benefit of not having

8    to plead to that sole felony, he was asked to plead to the 1752

9    offense.  Where Mr. Barnard was given the choice of the

10   misdemeanor offenses, which I'm sure, as the Court is well

11   aware now, most of them are pleading to the 1504(e)(2)(G).  So

12   that's the distinction of the charges, Your Honor.

13        THE COURT:  Okay.  And what were the -- what were the

14   actions inside the Capitol Building that led to a felony

15   charge?

16        MR. REGAN:  So for Mr. Witcher inside the building,

17   as the government described, there's -- there were several

18   videos that he himself took, which included him participating

19   in chants and yelling at law enforcement officers, which I'm

20   happy to elaborate during his allocution, making statements,

21   either berating law enforcement officers or participating in

22   some of the fervor inside the building that Mr. Barnard, quite

23   frankly, was just not captured doing any of.

24        THE COURT:  Okay.  So it's not necessarily a matter

25   that they did anything different; it's just a matter of what

1   evidence you had?

2           MR. REGAN:  Well, I think it is -- it is a matter of

3   doing things differently, Your Honor.  They both entered the

4   building.  Once inside the building, based on the evidence

5   that's available to the government, Mr. Barnard was more of

6   a -- I don't want to call it passive, but there's no video of

7   him yelling at law enforcement officers, participating in

8   chants, things like that inside the crypt that Mr. Witcher is

9   captured doing.  So the distinction is really what they did

10  once they entered the building.

11          THE COURT:  Okay.  Well, my question is a little bit

12  more nuanced than that.  Is it that you don't think he did any

13  of those things, or you don't have videos of him doing any of

14  those things?

15          MR. REGAN:  Your Honor, at this point the government

16  doesn't believe he did any of those things with respect to

17  Mr. Barnard.

18          THE COURT:  Okay.  All right.  All right.  So go

19  ahead and continue with your allocution with respect to

20  Mr. Barnard then.

21          MR. REGAN:  Yes, Your Honor.  And, again, I'm not

22  going to belabor the point in our sentencing memorandum.  I

23  think a good place for the Court to start, though, when

24  fashioning appropriate sentences in these cases is on a, sort

25  of, macro scale, and that's looking at January 6th at large.

1    And then, ultimately, which is the Court's obligation, is

2    taking a look at what this individual defendant did that day

3    and then balancing them, which is something the government has

4    been trying to do too for equity purposes.

5         So from that lens, like we've noted, what happened on

6    January 6th is unquestionably one of the darkest moments in

7    modern American democracy.  We all watched -- and the world

8    watched -- you know, on CNN and Fox News and across the world

9    as the building that is sort of the foundation and the pillar

10   of our democracy was breached by mobs of rioters, thousands of

11   people, with violence, destruction, theft, and the building was

12   overrun.  And it was happening live on television for the world

13   to see, and it is certainly a stain on America and American

14   democracy.

15        Now, on a macro scale, that included things like law

16   enforcement officers, you know, being hurt, abused.  People

17   died that day.  There was over a million dollars in damage to

18   the building.  All of these things as rioters -- we watched on

19   television -- traipsed around the building as if they're on a

20   sightseeing tour, when very clearly they were not supposed to

21   be there, and it was very obvious that they knew that.

22        Against that backdrop, with respect to Mr. Barnard, the

23   government has made great effort to create a sentencing plan

24   where we are not only addressing the individual defendant but

25   trying to address defendants that did similar things and

1    getting them similar plea agreements and a sentencing

2    allocution scheme.

3          With respect to Mr. Barnard, he entered the building

4    that day, which is a distinction between him and several other

5    rioters that day.  There were a lot of people on Capitol

6    grounds that day or in D.C. that day that chose not to go into

7    the U.S. Capitol Building.  That is a big distinction among

8    rioters that day.  And, unfortunately, he was one of the ones

9    that did enter the building.

10          To be fair, Mr. Barnard did not participate in any

11   violence.  There is no indication that he shouted at law

12   enforcement officers, participated in chants, or anything like

13   that, but the government believes it is a big deal that he

14   actually entered the building.  And he entered the building at

15   a time when it was volatile.  There was violence occurring all

16   over the Capitol Building, and not necessarily just where

17   Mr. Barnard was or where he was at the time.  But he was part

18   of a mob of people that entered the building and ultimately

19   made it into the crypt.

20          And as you've read in the government and defense

21   sentencing memorandums, the crypt was a particularly

22   volatile -- at a particular volatile moment in time.  They

23   entered in there and the police were severely outnumbered, just

24   like they were everywhere else in the Capitol that day.  The

25   numbers of -- you know, 10, 15 to 1, rioters to law

1     enforcement.  And they came in that day in droves.  It wasn't

2     just Mr. Witcher and Mr. Barnard that came in through -- into

3     the crypt at that point in time.

4          There was hundreds and hundreds of people piling into

5     the crypt and the surrounding areas, like the rotunda, which

6     had a tremendous impact not only on the officers there, but law

7     enforcement's ability to actually get the scene under control,

8     which took hours after that, roughly six hours, until they were

9     able to get the building secure again.

10         Now, Mr. Witcher -- or excuse me.  Mr. Barnard, like I

11    said, wasn't shouting, wasn't screaming, didn't hurt anybody,

12    but I wouldn't call him a passive participant on January 6th.

13    Going inside the building was a knowing act.  He was there

14    with -- surrounded by other people, including Mr. Witcher, who

15    were screaming at law enforcement, calling them traitors,

16    telling them to remember their oath, things like that, and he

17    was still there.

18         Now, he's certainly not the worst offender on

19    January 6th.  I don't think anybody would disagree with that

20    fact, but putting it in the backdrop of January 6th at large

21    and Mr. Barnard's actions that day, it matters.  And what

22    happened that day matters.

23         Now, the government also addressed in our sentencing

24    memorandum, there are mitigating factors in this case, and the

25    government doesn't hide from those because they are notable.

1       With respect to Mr. Barnard and Mr. Witcher, they both came to

2       the aid of law enforcement inside the crypt that day.

3               THE COURT:  What evidence do you have of that, other

4       than their statements?

5               MR. REGAN:  So, Your Honor, we actually corroborated

6       that on our end through the FBI.  We've actually identified

7       that officer, like Mr. Salinas noted in the sentencing

8       memorandum from the defense.  And that officer corroborated

9       that event.  Along with Mr. Barnard and Mr. Witcher, there was

10      a handful of others, as officers were being overrun, that sort

11      of formed like a picket fence around them to prevent them from

12      being trampled.  And that is notable, and that is why the

13      government points it out.

14              I think it's also notable that they didn't take part in

15      any violence.  They did not destroy any property or steal

16      anything, all of those things that the government has addressed

17      in the sentencing memorandum.

18              They were fully compliant with law enforcement.  They

19      provided voluntary interviews.  And one thing I do want to

20      address, Mr. Salinas pointed out, is that the government used

21      as an aggravating factor military service.  And to a certain

22      extent, the government does believe that is an aggravating

23      factor because based on the training and experience that those

24      gentlemen have, you would expect to hold them to a higher

25      standard.

1          I think it is also worth noting as a fellow veteran,

2     that is not to say that -- and a fellow Marine, that is not to

3     say that the government doesn't also concede that military

4     service is admirable, and it's certainly something that cuts

5     both ways, but I just wanted to put that on the record.

6          THE COURT:  But let me ask you this question about

7     that point.  You know, obviously some of the allegations

8     against some of the Oath Keepers, it seemed like they used

9     their military training on that day.  It doesn't seem to me

10    that these two are in that same category.  It doesn't seem like

11    they used their military training to -- for anything on that

12    day.  Would you agree with that?

13         MR. REGAN:  I would agree with that, Your Honor.

14    There's no suggestion by the government that they used any

15    military tactics or training to breach the building or -- you

16    know, we've all heard of the stacks and things like that.

17    There is no indication that either of these defendants did

18    that.  The suggestion from the government is just that as being

19    prior Marines and prior Army soldiers, that we would expect to

20    hold them to a higher standard and expect them to know that a

21    secure facility like this is not somewhere that they can just

22    breach and traipse around like sightseers, but I think it is

23    worth pointing out that the government doesn't just consider

24    that an aggravating factor.

25         So with respect to Mr. Barnard, Your Honor, his case is

1    obviously a little bit more clear-cut in terms of the facts.

2    That's why we're asking for 30 days of home confinement, the

3    60 hours of community service, the 36 months of probation, and

4    the $500 of restitution agreed upon in the plea agreement.

5         One final note.  I think that the -- the selfie-style

6    photograph of these two individuals inside the building is sort

7    of telling or a microcosm of that day.  It would make one

8    believe, if they didn't know any better, that these gentlemen,

9    along with all these other rioters, were on a sightseeing tour,

10   except that they're inside the United States Capitol as it's

11   being violently breached by thousands of people, which is

12   offensive to most Americans and American democracy.

13        So for all those purposes, Your Honor, that's why we're

14   asking for that sentence for Mr. Barnard.

15             THE COURT:  All right.  Thank you.

16        Mr. Salinas.

17        MR. SALINAS:  Thank you, Your Honor.

18        And I will try to, kind of, truncate or have my

19   statements be as brief as possible but at the same time address

20   some of the things that the government addressed here today.  I

21   did file my sentencing memorandum and a response to the

22   government's sentencing memorandum, which is -- you know, kind

23   of, gives the backdrop of what we're asking for today and what

24   we're asking the Court to consider.

25        You know, the government does have a difficult job;

1    there is -- this is -- just by the sheer massive number of

2    defendants in this case, to try to come up with a sentencing

3    scheme for all these individuals and, kind of, place them into

4    categories.  I know you've addressed the Oath Keepers as far

5    as, you know, people that are at the high end of that spectrum

6    that caused violence towards officers and destruction.

7        At the very far end of that spectrum is Mr. Barnard who

8    I don't think fits into any of the categories that the -- this

9    Court or any of the other courts have sentenced so far.  I

10    believe the unique individual circumstances in his case

11    present -- are by far unique and extraordinary.  There is

12    evidence -- looking at the evidence provided in discovery,

13    somebody could spend a career or a lifetime going through the

14    sheer amounts of discovery.

15        But the -- the government did provide the specific

16    discovery and recordings and interviews that are addressed to

17    Mr. Barnard, and those indicate and show that the resistance

18    that they met was not until they had entered into the Capitol

19    and they're in the crypt.  There's minutes before violence

20    starts occurring.  And I think that's evident in the selfie

21    that Mr. Witcher took, is that you see officers behind them,

22    kind of, just milling around.

23        At some point when the large group of individuals start

24    rioting, Mr. Barnard and Mr. Witcher make it a point to try to

25    calm people down and then use themselves as human shields.  So

1    I would say that it's actually that their military experience

2    helped officers that day and that they did not run the other

3    way, they did not lose sight of their convictions, lose sight

4    of who they are, and they said, "Hey, this is not right.  This

5    is wrong."  And they tried to help officers.

6         As soon as they made sure that those officers were

7    safe -- and I did identify that officer in my sentencing

8    memorandum -- then they exited the building and realized that's

9    not what we're here for.  And I think that's quite telling

10    for Mr. Barnard, is that his story throughout this -- and his

11    version of the events -- have been consistent from the day that

12    he voluntarily called the FBI and met with them and interviewed

13    with them.  It is the same story that he said throughout from

14    his point of view.

15         Now, once he was confronted with, hey, look, people

16    caused destruction, people died, people attacked officers, he

17    realized that at that point he was part of something that was

18    bigger and realized at that point that's not who he was.  And

19    he agreed that this was a stain on democracy, and he agreed

20    that these events will forever be linked to him.  But at that

21    point, there's nothing he can do other than keep apologizing,

22    keep trying to be remorseful, and show regret, but that has

23    been consistent.

24         I had the privilege of meeting Mr. Barnard at his

25    initial appearance here in the Austin division when he was

1    arrested and detained overnight.  And when I met him, the first

2    thing he says, "I want to plead guilty.  I don't want to fight

3    this.  I want to accept responsibility for my actions."  And,

4    ultimately, that's what the Court has to do today.

5        They have to look at his individual actions, and I

6    understand that there's a backdrop of hundreds of other

7    defendants in one of the largest, I guess, events in our

8    history.  But at the same time, the 3553(a) factors, which the

9    Court has to consider, are looking at his individual acts and

10   his individual circumstances.  They are unique.

11       And we are asking that -- any term of home -- home

12   confinement or home detention would ultimately cause

13   Mr. Barnard, who is the sole provider to his wife and children,

14   to lose his job.  Prior to January 6th, Mr. Barnard had never

15   lost a job.  He'd never been fired from a job.  He had never

16   been unemployed.  He had never been arrested.  He had never

17   been charged with a crime.  All of that changed January 6th,

18   and he knows that, and that's the burden that he has to bear.

19       I understand he is quite nervous today, more nervous for

20   his family's sake.  He asked that I address this Court.  I know

21   he is -- he's willing to answer any questions that this Court

22   has, and I have no doubt he will have the same version of

23   events that he did when he met with officers on his own accord

24   back in January.

25       He -- and I, kind of, highlighted that -- some of his

1    statements to officers that day in my sentencing memorandum

2    where he indicated to them, "My worst fear is that this will

3    follow me for the rest of my life."  And I think it will.  It

4    will follow him for the rest of his life.  But at the same

5    time, he was afraid he would lose his job.  That came true.  He

6    lost his job.  He was unable -- due to the media attention of

7    this case, you know.

8         He was originally indicted -- or originally charged by

9    complaint with the misdemeanor offenses and also he was

10   indicted on those misdemeanors only.  But the agents came and

11   told him, "Don't worry.  You've been cooperative with us.

12   We're not going to come and arrest you.  We'll give you an

13   opportunity to self-surrender."  That wasn't true.  He was

14   arrested at work late in the afternoon.  They coordinated an

15   arrest of him where he was in front of his coworkers where he

16   was a home builder.  He lost that job due to that public

17   arrest.

18        And he's not trying to blame anyone.  He's just trying

19   to show factually that any sort of home confinement would

20   ultimately cost him another job.

21             THE COURT:  Mr. Salinas, can you explain that to me?

22   The way -- the way we do home confinement, at least in this

23   district, is that individuals are allowed to work during the

24   period of home confinement.  Why do you think he would lose his

25   job if he was subjected to, let's say, the 30 days the

1     government is asking for?

2          MR. SALINAS:  Well, it's my understanding -- I guess

3     in my division, home confinement means you can't leave.  You

4     are -- you're on monitor.  You're at home.  You cannot come and

5     go as you please.  And that's why I'm making this -- this

6     assessment, Your Honor.

7          THE COURT:  So if we used our traditional home

8     confinement here, which allows people to leave for purposes of

9     work and church services and medical appointments and the

10    like -- they can't just go out to, you know, get a beer after

11    work -- do you think the fact that he has an ankle monitor on

12    would cause him to lose his job?

13         MR. SALINAS:  I don't believe so, Judge.  But I think

14    that the fact and circumstances of his case do not warrant that

15    extra supervision based on the -- and I guess I should have

16    started off with this.  My client from the get-go did not want

17    to point fingers, did not want to say, "Hey, look at what this

18    person got and look at what this person did."  He said, "I want

19    to be held accountable for what I did that day."

20         But when we have these schemes -- these sentencing

21    schemes, we have to point and look at others that have been

22    sentenced or similarly situated.  I don't believe anybody is as

23    similarly situated as Mr. Barnard and Mr. Witcher.  I have not

24    seen in any of the evidence, I have not seen in any prior

25    sentencings where individuals who were charged with crimes

1   actually came to the aid of officers.  So I think in that

2   respect, he is unique and different.  And that's why I

3   believe -- I don't believe further supervision is -- would be

4   required to meet the -- the 3553(a) factors.

5          I believe -- and that's why we were asking for a

6   time-served sentence.  But at the end of the day, Mr. Barnard

7   informed me -- and I think he'll inform the Court too -- that

8   he respects this Court's decision.  But we are asking that

9   if -- if -- if His Honor does not feel that a time-served

10  sentence is appropriate, that further supervision is needed,

11  that we believe that 12 months without a period of home

12  detention, home confinement would be sufficient based on him

13  being on, essentially, supervision this last year without any

14  hiccups or without any -- any concern.

15          THE COURT:  All right.  Thank you.

16      Mr. Barnard, do you wish to address the Court?

17          DEFENDANT BARNARD:  I don't know what else to say.

18          I've lost a six-figure job.  I've had my bank account

19  shut down.  I can't cosign for my own daughter's apartment with

20  a 750 credit rating because my bank of 30 years with a home

21  loan shut me down and -- and put on my credit rating the words

22  derogatory public record, like I'm some kind of criminal or

23  terrorist or drug dealer.  I -- I had to get my in-laws to

24  cosign my own daughter's apartment.

25          I've lost -- I say I've lost everything.  I have lost a

1    career that I've worked my tail off for decades.  I lost a

2    six-figure income, and I'm working for half -- less than half

3    what I was making before.  My retirement is gone.  My savings

4    are gone.  There is nothing that the Court can do to me at this

5    point that will even come close to what I have lost.  Nothing.

6         If this is to prove a point that I shouldn't have been

7    there, I get it.  I got it.  What -- the only thing I have

8    left -- and I've got property taxes coming in for $7,000 that I

9    don't have and I'm trying to muster up.  There is nothing that

10   the Court can do to me that is worse than what I've done.

11        I went from my saying this has ruined me, they've ruined

12   me, they've ruined me -- I came to a realization about -- it

13   was about two months ago.  I said, "Nobody's ruined me."

14   They've ruined my career.  This is -- not they.  This has

15   ruined my career.  It has not ruined me.  I've got my wife, I

16   have my kids, and I have my friends and my family all standing

17   behind me who know who I am.

18        Did I do something wrong?  Yes.  Did I know I couldn't

19   be there?  This is what kicks my tail is that I did not have

20   the self-awareness, the situational awareness to understand

21   what was going on.  I have videos on my phone where people

22   walked onto the Capitol grounds.  There were people everywhere.

23   I spent the entire morning trying to find anyone who wasn't

24   6-foot-3 200-pound white male to talk to that day, just wanted

25   to talk to people about why they were there.  That's all I was

1     doing was taking video.

2         I happen to be at the very top front when somebody

3     yelled, "We're going in."  There was no way -- we fought our

4     way getting out of that building, getting called every name in

5     the book as we left that building.  I mean, they cussed us up

6     one side and down the other as we fought our way through that

7     crowd still piling into that building to get out of there,

8     after we got those officers to safety.

9         There was half a dozen of them in the crypt, maybe eight

10    of them.  We formed a barrier -- it was me, Shane, and at least

11    one other man -- stood in front of the crowd, and that crowd

12    knew -- because of, once again, our military experience, they

13    knew they weren't going to touch those officers.  Period.

14    That's the first time I saw officers, first time I knew I

15    wasn't supposed to be there.

16        We asked those officers after we got behind them, "Do

17    you have a place to go?"  They said yes.  "Go there now.  We

18    will take your six."  We took their six back to another area

19    where there was about a dozen more.  Instantly, Shane and I

20    both scanned for is anybody injured, is anybody hurt, anybody

21    needing assistance.  The worst we saw was a raspberry on the

22    left check of one officer and a lot of tired, very tired,

23    scared officers.  We walked around to them, shook hands, told

24    them we're sorry, this is not what this was all about.  It

25    never was supposed to be this, asked them how we get out of

1    there.  And two of them helped us out of there.

2         That was the first time I saw a broken window.  This --

3    I hung my head going, my God, what has happened here?  We

4    walked out of that place.  We got out of that little window and

5    went through the crowd, and we were called every name in the

6    book as we got off that property.  And halfway back to my

7    hotel, my wife texted me and said, "Somebody's been killed."

8         "No, they haven't.  Just a bunch of people being

9    stupid."

10        We got back to the hotel and found out what had gone on,

11   just -- we were appalled.  There was nothing we could say or

12   do.  I mean, we're -- we're done.  We knew right then.  We're

13   done.

14        I went back to work, tried to live my life.  My bosses

15   didn't -- they tried to cover up for me, but when the FBI

16   surrounded that building, my -- my work, with a full-on SWAT

17   team and took me out of there -- they walked through the door

18   and shoved me around like I never would have done an officer,

19   not in my wildest dreams.  Took me out of my place of work and

20   put my arms in handcuffs and put me in a car and took me out of

21   there.  That's what got me fired.

22        The owners of the company found out and knew my name

23   because I was the most awarded builder for my builder in the

24   two and a half years I've been with them.  I have plaques,

25   T-shirts, tools, dress shirts.  They were trying to find what

1    to give me to award me.  They didn't want me gone, but the

2    owners found out, and it was done.  They came down from Dallas

3    and fired me on the spot on April 22.

4         And I was out of work for months because nobody would

5    hire me.  My friend who owns a roofing company needed someone.

6    He needed me more than anybody's ever needed me, but he can't

7    afford to pay what I was being paid.  So he --

8         Again, all I can tell you is there's nothing that the

9    Court can do to me to make it worse.  If you put me on

10   detention, fine.  I get it.  I get it.  But there's nothing you

11   can do to make it worse than what I've already gone through.

12   It's just going to be -- drag it out until it's over with.

13        I have a plan for starting my own business one day, but

14   it's going to take a year after this ends before I can get the

15   license I need.  I can't have probation on this for a license.

16   I can't have whatever is going to go on.  So that's all I've

17   got to say.  There's nothing I can do to change it, and nothing

18   I can say to change whatever y'all are going to do to me.

19             THE COURT:  Thank you.

20        So let's start with the financial issues.  The parties

21   have agreed to an amount of restitution, which is $500, paid to

22   the Clerk of the Court to be forwarded to the Architect of the

23   Capitol.  The maximum fine available is $5,000, although

24   probation has indicated he has an inability to pay.  I'm not

25   going to impose a fine given the financial strain getting fired

1    has put on that family.

2         The Court is to impose a sentence sufficient but not

3    greater than necessary to comply with the purposes set forth in

4    the subsection.  I'm to consider the nature and circumstances

5    of the offense and the history and characteristics of the

6    defendant, impose a sentence that reflects the seriousness of

7    the offense, promotes respect for the law, and provides just

8    punishment for the offense.

9         Of course, the offense is serious.  A number of my

10   colleagues have spoken eloquently about this.  Defendant took

11   part in the mob riot that took place at the Capitol on

12   January 6th, 2021.  Many of the rioters engaged in violence and

13   some destroyed property.  I've watched numerous videos of

14   rioters engaging in hand-to-hand combat with police officials.

15   It was not a peaceful event.  More than a hundred law

16   enforcement officers were injured on that day.  Moreover, the

17   Capitol sustained almost $1.5 million in property damage.  Many

18   of the rioters intended to block the certification of the votes

19   for President Joe Biden, and although the rioters failed to

20   block that certification, they delayed it for several hours.

21        The security breach forced lawmakers to hide inside the

22   House gallery until they could be evacuated to undisclosed

23   locations.  In short, the rioters' actions threatened the

24   peaceful transfer of power and a direct attack on our nation's

25   democracy.

1          With that said, no evidence has been presented that

2     shows defendant assaulting law enforcement or destroying

3     property.  After entering the Capitol Building through an

4     entrance at which law enforcement had been overwhelmed a short

5     time beforehand, the defendant entered with his codefendant,

6     made their way to the rotunda, and remained inside for a period

7     of about 15 to 20 minutes.

8          The riot was successful in delaying the certification,

9     in large part, because of the numbers of participants involved,

10    which simply overwhelmed the outnumbered law enforcement

11    officers present.  Regardless of the defendant's intentions,

12    because he contributed to those numbers, he has to be held

13    accountable for his actions and the results to which his

14    actions contributed.

15         However, evidence has been presented that the

16    codefendants helped shield law enforcement officers in the

17    rotunda when the tenor of the interactions began turning

18    violent.  That is to their credit.

19         The defendant also destroyed electronic evidence on his

20    cell phone that could not be recovered by the FBI.  Subsequent

21    to January 6th, however, he voluntarily cooperated fully with

22    the FBI, submitting to an interview and a search of his phone

23    and pleading guilty at the earliest opportunity.

24         Otherwise, defendant has no criminal history.  He's a

25    56-year-old man with some college education.  He served in the

1   Marines and served during wartime, although the details of his

2   discharge are unclear.  Since that discharge, he appears to

3   have been gainfully employed for the majority of his adult

4   life.  Otherwise, defendant's background is not particularly

5   remarkable.

6          His parents divorced when he was young, but there's no

7   indication that his material needs were not provided for.  He

8   lived with his father who was reported to be a successful

9   businessman.  Tragically, his father took his life after

10  experiencing financial difficulties, but this occurred after

11  defendant was an independent adult.  Mr. Barnard is married

12  with children and appears to have a strong family support

13  system in place.

14         The Court is to impose a sentence that affords adequate

15  deterrence of criminal conduct, protects the public from

16  further crimes of the defendant.  The events of January 6th

17  involved a rather unprecedented confluence of events spurred by

18  then President Trump and a number of his prominent allies who

19  bear much responsibility for what occurred on that date.  Since

20  Mr. Barnard's arrest, he seems to have done well while on

21  release status, and the Court is confident that given his lack

22  of prior criminal history and lack of a violent past he's

23  unlikely to reoffend, will not be emotionally swept up in

24  irrational actions, and will not be a risk to the public.

25         With respect to general deterrence, the Court does not

1    believe that incarceration or a lengthy home confinement is

2    necessary to deter other nonviolent protesters from crossing

3    the line into lawbreaking.  The defendant's ordeal through the

4    criminal justice system, restitution, community service, and

5    probation with limited home confinement should serve as an

6    adequate deterrence to those who can be deterred.

7         The Court is to impose a sentence that provides the

8    defendant with needed educational and vocational training,

9    medical care, or other correctional treatment in the most

10   effective manner.  Nothing with respect to this has been

11   brought to my attention.  And I'm to consider the kinds of

12   sentences available.  Given the nature of the crime and the

13   defendant's lack of criminal history, this Court is only

14   considering a period of probation that contains limited

15   restrictions and imposes home confinement for a short period of

16   time.

17        The Court is to impose a sentence that reflects the

18   sentencing range established for the applicable category of

19   offense committed by the applicable category of defendant as

20   set forth in the guidelines.  The Court is cognizant that the

21   guidelines do not apply.  No pertinent policy statements issued

22   by the Sentencing Commission have been brought to my attention.

23   The Court is to impose a sentence that avoids unwarranted

24   sentence disparities among defendants with similar records who

25   have been found guilty of similar conduct.

1          The government has provided a chart that lists a number

2     of January 6th defendant sentencings.  There is not enough

3     granular information there to make apt comparisons.  However,

4     the list does make it clear that the government has recommended

5     noncustodial home confinement probation sentences in a number

6     of these cases.  The Court finds it hard to distinguish this

7     case from those.

8          I already dealt with the $500 restitution to which the

9     parties agreed.

10         I'll now indicate the sentence to be imposed, but

11    counsel will have one more opportunity to make any legal

12    objections before the sentence is imposed.

13         Mr. Salinas, do you have any objections to the factors

14    I'm considering?

15            MR. SALINAS:  Judge, not -- there's not any legal

16    objections, but I did also want to point out, I know a number

17    of other defendants who have been sentenced by the courts after

18    they were initially arrested posted on social media and tried

19    to minimize the situation.  Mr. Barnard did none of that.

20    There were no postings by him before nor after.  At any point

21    he has not tried to minimize or mitigate what actually happened

22    on January 6th.  So I wanted to point that out.

23         So I wanted to point out that, essentially, the --

24    the -- what we are asking for would be different -- is actually

25    something difficult to do, but I think the specific factors

1     that Mr. Barnard's case presents actually -- I don't believe

2     that would be an unwarranted sentencing disparity.  I believe

3     it would be warranted for him to -- to be given something

4     different than what has already happened to other defendants.

5              THE COURT:  I understand that.  I mean, the reality

6     is that the -- for defendants such as your client, the going

7     rate seems to be the government is now requesting

8     incarceration.  So I think the fact that they're requesting

9     just home confinement is -- takes into consideration all those

10    factors.  And I certainly take it all into consideration.

11         Mr. Regan, do you have any objections to any of the

12    factors I'm considering?

13              MR. REGAN:  I do not, Your Honor.

14              THE COURT:  It is the judgment of the Court that you,

15    Richard Franklin Barnard, are hereby sentenced to serve a

16    12-month term of probation on Count 5, and the term of

17    probation shall include a one-month term of home confinement,

18    location monitoring, which I'll explain shortly.

19         You are further ordered to pay a special assessment of

20    $10 by statute.  As I indicated, I'm going to waive the fine

21    given the period of unemployment your family suffered and the

22    reduction in income that resulted thereafter.  The special

23    assessment and -- is payable to the Clerk of the Court and --

24    as well as the restitution to the Architect of the Capitol in

25    the amount of $500.  Within 30 days of any change of address,

1     you shall notify the Clerk of the Court until such time as the

2     financial obligation is paid in full.

3          While on supervision, you shall not use or possess an

4     illegal controlled substance, and you shall not commit another

5     federal, state, or local crime.  The mandatory drug testing

6     condition is suspended based on the Court's determination that

7     you pose a low risk of future substance abuse.  You shall also

8     abide by the general conditions of supervision adopted by the

9     U.S. Probation Office, which will be set forth in the judgment

10    and commitment order, as well as the following special

11    conditions:

12         Location monitoring.  You shall be monitored by

13    radiofrequency or GPS monitoring at the discretion of the

14    probation office supervising you, and you shall abide by all

15    the technology requirements for a period of one month.  So the

16    monitoring restricts your movement in the community and

17    restricts you to your residence at all times except for

18    employment; education; religious services; medical, substance

19    abuse, or mental health treatment; attorney visits; court

20    appearances; or court-ordered obligations, which includes the

21    community service; or other activities as preapproved by the

22    probation office.

23         With respect -- I -- because there are some amounts

24    outstanding, including the restitution, there's some financial

25    disclosure requirements that come with it, but to the extent

1     that you pay those things up front, you won't have to deal with

2     those things.  So I -- to the extent you can, I would advise

3     you to pay them up front.

4         All right.  Counsel, Mr. Salinas, other than those

5     things previously argued, do you have any objection to

6     imposition of the sentence as just stated?

7         MR. SALINAS:  Judge, I don't think I heard -- you may

8     have said it.  How many hours of community service?

9         THE COURT:  I'm sorry.  Sixty hours of community

10    service to complete -- to be completed within the six months.

11        MR. SALINAS:  Okay.

12        THE COURT:  I apologize for that omission.

13        MR. SALINAS:  And -- and I did have one more

14    question, and I know we raised it previously to the Court, but

15    we were waiting for the sentence to address again.  Because

16    this is a misdemeanor or a petty offense, he's not precluded by

17    law of possessing firearms.  But I understand that's the

18    standard condition for probation for someone who is on a

19    misdemeanor or felony.

20        But Mr. Barnard is an avid hunter, which he hunts

21    seasonally to provide food for his family.  We are asking for a

22    special exception where he would report if he's hunting, to

23    have possession while -- for hunting purposes with permission

24    from his probation officer, if the Court could make that

25    finding.

1          THE COURT:  So possession for purposes of hunting

2    with permission from probation?

3          MR. SALINAS:  Correct, Your Honor.  So he would have

4    to, essentially -- once -- he'd have to get permission from his

5    probation officer, you know, provided that he give the

6    information of who he would be hunting with and what hunting

7    season in order to -- to maintain that Second Amendment right.

8          THE COURT:  All right.  Mr. Regan, do you have any

9    opposition to that?

10          MR. REGAN:  Your Honor, the government does oppose

11    that.  I think that that's a slippery slope in terms of

12    individual defendants.  So I will just put on the record the

13    government opposes that request.

14          THE COURT:  Okay.  Mr. Salinas, I'm amenable to that

15    request.  I would like to talk to probation -- our probation

16    folks before I do that, but I don't -- I personally have no

17    objection to that --

18          MR. SALINAS:  Okay.

19          THE COURT:  -- requirement.  And to the extent I feel

20    comfortable doing it, I'll include it in the judgment and

21    commitment order.

22          MR. SALINAS:  Thank you, Your Honor.

23          THE COURT:  All right.  And I gather that Counts 2,

24    3, and 4 of the information need to be dismissed; is that

25    correct, Mr. Regan?

1          MR. REGAN:  That's correct, Your Honor.  And the

2    government motions the Court to do so.

3          THE COURT:  Okay.  I --

4          THE COURT REPORTER:  Sorry, Judge.  We can't hear you

5    right now.

6          THE COURT:  I will go ahead and do that, get those

7    counts dismissed.

8          All right.  Mr. Barnard, you were convicted by a plea of

9    guilty.  You can appeal your conviction if you believe that

10   your guilty plea was somehow involuntary or if there's some

11   other fundamental defect in the proceedings that were not

12   waived by your guilty plea.  Your guilty plea did waive a

13   number of your appellate rights.  So if you're inclined to

14   appeal, go ahead and discuss that with your counsel.  You also

15   have a statutory right to appeal your sentence under certain

16   circumstances to the extent not waived by your guilty plea.  So

17   I would consult on those as well.

18          And to the extent you do choose to appeal, you have the

19   right to apply for leave to appeal in forma pauperis -- that

20   means without the payment of costs -- if you request and

21   qualify.  The clerk can help you prepare and file a notice of

22   appeal on your behalf, although I note that you're represented

23   by able counsel that can assist you in that process.  But most

24   importantly, with few exceptions, any notice of appeal has to

25   be filed within 14 days of the entry of the judgment.  It's a

1    Friday afternoon.  So it's -- the judgment will not be entered

2    today, but presumably it will be entered early next week.  So

3    14 days from that point, to the extent you choose to appeal.

4           Now, the probation office has requested that I transfer

5    jurisdiction of the supervision to the Western District of

6    Texas.  Is that the right district?

7           MR. SALINAS:  That is, Your Honor.

8           THE PROBATION OFFICER:  Yes, it is, Your Honor.

9           THE COURT:  Okay.  All right.  Any objection to that

10   transfer?

11          DEFENDANT BARNARD:  None.

12          MR. SALINAS:  None from Mr. Barnard.

13          MR. REGAN:  No, Your Honor.

14          THE COURT:  I'll go ahead and fill out the paperwork

15   to get that transfer made.

16          Anything else we need to get resolved with respect to

17   Mr. Barnard?

18          MR. REGAN:  Nothing from the government, Your Honor.

19          MR. SALINAS:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Mr. Barnard, you're welcome

21   to stay on and see how your friend fares, or you can take

22   Friday afternoon off, whatever your pleasure is.

23          DEFENDANT BARNARD:  I'll quietly hang on.  Thank you.

24          THE COURT:  All right.  Mr. Witcher, are you ready?

25          DEFENDANT WITCHER:  I am, Your Honor.

1          THE COURT:  Defendant, Mr. Witcher, and defense

2     counsel, have you reviewed the presentence report as revised

3     following the defense and the government's submissions?

4          MR. BASSETT:  Yes, Your Honor.

5          THE COURT:  Okay.  Any additional objections?

6          MR. BASSETT:  No, Your Honor.

7          THE COURT:  Okay.  Under Federal Rule of Criminal

8     Procedure 32(i)(3)(A), the Court will accept the presentence

9     report as its findings of fact on issues not in dispute.

10          This case, contrary to the prior one, falls within the

11     Sentencing Reform Act of 1984 under which Congress created the

12     Sentencing Commission which has issued detailed guidelines for

13     judges such as myself to consider in determining the sentence

14     in a criminal case like this.  The commission has set those

15     ranges in the *Guidelines Manual*, but in light of the

16     Supreme Court's decision in *Booker*, the guidelines are not

17     mandatory; they're advisory.  But they must be consulted by the

18     Court in determining the appropriate sentence in a case.

19          Therefore, I will assess and determine the proper

20     sentence in this case by reference to and in consideration of

21     the guidelines in the first instance, but the guidelines will

22     be treated as advisory, not mandatory, and there's no

23     presumption that the guidelines sentence is the correct

24     sentence.  The guidelines will be considered, along with all

25     the other relevant factors under 18 U.S.C. 3553(a).

1       Defendant has pled guilty to a Class A misdemeanor,

2   which is Count 2, entering and remaining in a restricted

3   building or grounds in violation of 18 U.S.C. § 1752(a)(1).

4       Using -- as reflected in the presentence report, using

5   the *2021 Guidelines Manual*, base offense level is 4.  There's a

6   2-upward adjustment for trespass occurring in a restricted

7   building, which results in an adjusted offense level of 6.

8   There's a two-level decrease for clear demonstration of

9   acceptance of responsibility, which brings it to a total

10  offense level of 4.  Defendant has no criminal history, which

11  puts him in Criminal History Category I.  The guidelines range

12  for imprisonment based on a total offense level of 4 and a

13  criminal history category of I is zero to six months.

14      Any objections to those calculations?

15          MR. BASSETT:  No, Your Honor.

16          MR. REGAN:  No, Your Honor.

17          THE COURT:  All right.  As I've said, under *Booker*

18  the guidelines are advisory in this case but will be considered

19  fully by the Court, along with the other relevant factors under

20  the sentencing statute.

21      Would the government like to address the Court regarding

22  Mr. Witcher?

23          MR. REGAN:  Yes, Your Honor.

24      And, Your Honor, I'll ask how the Court wants to do it.

25  So there are a couple of videos I plan on playing that I can

1   share my screen with, that I indicated in the sentencing

2   memorandum.  I'm happy to allocute before I play them and go

3   after.

4               THE COURT:  I've watched everything that has been

5   submitted to the Court, but if you want to play them, I'm happy

6   to watch them again.

7               MR. REGAN:  In -- in that -- if that's the case,

8   Your Honor, then I'll save the Court the time.

9          So like I said earlier, with respect to Mr. Witcher, he

10  is somewhat differently situated than Mr. Barnard was.  They

11  traveled together.  They entered the building together, and

12  many of the actions they took that day were either similar or

13  exactly the same.  Notably, for Mr. Witcher, he also

14  participated with Mr. Barnard in coming to the aid of

15  officer -- one of the U.S. Capitol police officers, which the

16  government has noted in its sentencing memorandum and I've

17  spoken exhaustively with Mr. Bassett about as well.

18         The major distinction here and why the government is

19  asking for more home detention is what Mr. Witcher does once

20  inside the building.  Once inside the building, you can tell

21  that he's somewhat emotional about entering the building.  I

22  would describe it as jubilant.  And then when he first

23  encounters law enforcement officers in the crypt, although not

24  violent, he certainly has words for them, things like:  "Do or

25  die"; "Respect your oath"; "Don't be a traitor"; "Fulfill your

1    constitutional duties"; which, words on their own, are perhaps

2    menacing but certainly not violent.  But like the government

3    said earlier, you have to take that under the construct of

4    what's happening on January 6th inside that building.

5         Now, he is among throngs of rioters screaming at these

6    law enforcement officers, telling them to do what they want

7    them to do, which is not what their oath requires, which is not

8    what their duties require.  And when you take that into

9    account, it's not surprising that in the crypt when Mr. Witcher

10   is there, violence breaks out because he is among many that are

11   harassing these officers, following these officers, screaming

12   at these officers.  So although he does come to the aid of an

13   officer, he's also part of the mob in there, much more so than

14   Mr. Barnard, contributing to what ultimately leads to violence.

15   That is in no way to suggest that he is responsible for the

16   violence of others in terms of putting hands on officers or

17   anything like that.

18        But it is certainly not as benign as Mr. Barnard's

19   presence in the U.S. Capitol that day, and that's --  I

20   apologize, Your Honor.  I thought you spoke.  That's really the

21   notable distinction.

22        He's cooperative with law enforcement, just like

23   Mr. Barnard was.  He provides a voluntary interview.  He gives

24   access to his phone.  He also did delete some items from his

25   phone before the FBI could get their hands on it, but

1    ultimately the distinction is, like the Court pointed out

2    earlier, just the sheer number of people is something for the

3    Court to consider because that is what enabled January 6th to

4    become the day that it was.

5         And then you can separate those into classes of people

6    where are they just a number or are they sort of a force

7    multiplier because of how they're acting and the words that

8    they're saying while they're inside the building.  I think

9    Mr. Witcher falls into the category of a force multiplier

10   because he is saying things and doing things that are

11   encouraging others to act in a similar fashion.

12        Mr. Barnard being there is problematic.  Mr. Witcher

13   being there and saying the things that he says are more

14   problematic.  And it's for those reasons that the government

15   believes he deserves a more severe sentence than Mr. Barnard,

16   and we think that 60 days' home confinement, in addition to the

17   same conditions the Court imposed on Mr. Barnard -- we would

18   ask for more probation as well.  We've asked for 36 months --

19   are appropriate.

20        And I think the Court aptly pointed out in looking at

21   analogous cases that the going rate for some of these cases is

22   confinement.  And the government, although -- went back and

23   forth, ultimately didn't ask for confinement because some of

24   the mitigating factors were strong enough.  Like I've told

25   Mr. Bassett, that based on his criminal history, his

1    background, that we don't believe incarceration is necessary in

2    order to deter him, but we do think a more severe sentence than

3    that of Mr. Barnard is necessary for both general and specific

4    deterrence.

5         So for those reasons, Your Honor, the government is

6    asking for 60 days of home detention to be part of a term of

7    probation of 36 months, to include 60 hours of community

8    service, and the $500 restitution as agreed upon in the plea

9    agreement.

10        THE COURT:  So I understand your argument about the

11   differentiation between Mr. Witcher and Mr. Barnard with

12   respect to the aggravating factors, but as far as the

13   mitigating factors, Mr. Witcher has an incredible military

14   record for which he's paid a tremendous price.  How should I

15   factor that in?

16        MR. REGAN:  Well, Your Honor, that's something that I

17   think the government has considered.  Like I said, as a fellow

18   veteran, I think that is an extremely mitigating factor.  I

19   also think there's also some aggravating to it, and I did read

20   in the -- the presentence report, as someone sort of familiar

21   with it, what that jargon means.  He does have a distinguished

22   military career.  And if memory serves, it was actually two

23   branches of the military, both in the Marine Corps and the

24   Army.

25        And -- and I think it's certainly something for the

1    Court to consider, and I think where it's appropriately

2    considered is when the government made the decision not to act

3    for -- to ask for an active incarceration sentence, which other

4    similarly situated defendants are facing and he is facing as a

5    Class A misdemeanor.  I think that's where that should

6    appropriately be considered, which the government has also

7    considered when fashioning what we believe would be an

8    appropriate recommendation for the Court.

9            THE COURT:  Okay.  All right.  Let me see if I have

10   any other questions.

11           All right.  Mr. Bassett.

12           MR. BASSETT:  Good afternoon, Your Honor.

13           THE COURT:  Good afternoon.

14           MR. BASSETT:  There are -- I'm going to do my best,

15   Your Honor, not to repeat what's already been discussed at this

16   hearing with Mr. Barnard's case.  I may have some overlap.

17           I think there's some distinguishing -- obviously

18   Mr. Witcher will tell you he regrets yelling inside the

19   Capitol.  One of the things he yelled, just to show you the

20   kind of emotion that he was dealing with, was he said, "We're

21   in the White House."  I don't know what the interaction between

22   his PTSD and this situation was, but it was obviously something

23   he regrets very much.  And in my own sentencing memorandum, I

24   talk about the remorse he has for contributing in any way to

25   the -- the atmosphere that became really terrible, upon

1    entering into the Capitol.  So he'll talk to you about that.

2          He -- he also -- Mr. Witcher, inside the Capitol, he

3    will tell you he felt badly when he saw the eyes of the police

4    officers.  He felt badly.  He saw the fear in their eyes, and

5    it reminded him of soldiers under his command.  And he -- he

6    felt like he needed to do what he could to protect them at some

7    point.  Obviously, those are two, kind of, inconsistent themes,

8    yelling, you know, at the onset; and yet then when he sees the

9    officers, he -- a new emotion is injected in his brain.

10          And he realizes I've got to protect these young men

11   from -- from some of these things people are doing, throwing

12   fire extinguishers and things like so.  So it's a mixed bag for

13   sure, Your Honor.  But I think the -- the yelling was a very

14   temporal, emotional thing, and he came to his senses.  Not only

15   did he protect them -- and as Mr. Barnard talked about, they --

16   they were actually yelled at for leaving.  Once the officers

17   were in safety, they left, and -- and he realized that he had

18   done something really wrong, first, by entering the Capitol;

19   second, by participating in any way in any chanting.

20          But even while in the Capitol, he reversed course and

21   changed his mind and realized I've made a terrible mistake

22   here.  I've got to get out of here.  First of all, I've got to

23   protect these officers, and then I'm going to get out of here.

24   So I'm not saying that it all erases everything that he did

25   that was wrong, but it certainly mitigates it.

1     What happens after that, Your Honor, is significant in

2   my mind.  He -- he hears somebody in the community say, "The

3   FBI is looking for you."  So he calls the FBI agent himself

4   before he is called, and he readily participates with the FBI

5   less than two weeks after January 6th.

6     He hands them his phone.  He admits, "I deleted some of

7   the things."  Some of the very evidence used against him today

8   was provided by him voluntarily.  He didn't have a lawyer at

9   the time.  And he'll tell you what was going through his head

10   at that time was I've made a bad mistake here and I need to

11   help this law enforcement investigation move forward so these

12   guys don't have to do any more work than they have to to -- to

13   understand the situation.

14     Finally, Your Honor, I -- I would echo what you had

15   brought up, and that is, his service to the country.  Although,

16   obviously, in this situation you could say, you know, you

17   should have known better.  Two ten-year stints in the military

18   with some fairly hostile tours of duty and combat engagements

19   doesn't excuse his conduct, but I think it should be taken into

20   consideration.

21     What's extraordinary to me about Mr. Witcher from the

22   first time I met him here in the law office on a weekend, after

23   he had talked to the FBI and after he turned over his phone, is

24   he said, "Look, I'm willing to accept the consequences for what

25   I did.  I know I did wrong."  And that to me was unusual in a

1      first interview with a client.

2               THE COURT:  All right.  I just have a couple

3      questions for you.  I know he doesn't have any criminal history

4      points, but there were -- there's some arrests for assaultive

5      behavior well into his 50s, which raised my eyebrow.  Can you

6      shed any light on that?

7               MR. BASSETT:  You know, I -- I can't, but I believe

8      Mr. Witcher would be happy to.  I think that some of that may

9      be related to some of his posttraumatic stress disorder issues,

10     but I'm not going to -- I'm not deeply familiar with those

11     situations, Your Honor.

12              THE COURT:  Okay.  And then the other question I had

13     was probation has recommended mental health treatment, but I

14     read that he's already getting some counseling and he may have

15     access to it through the VA.  Do you know whether I should

16     order that?  Do you have an opinion as to whether I should

17     order additional mental health treatment through probation,

18     or does the VA have him covered?

19              MR. BASSETT:  I believe the VA has him covered,

20     Your Honor, not only for that but for his post-cancer.  He had

21     prostate cancer, and he's continuing treatments, both --

22     treatment evaluations for that.  So I think he's -- he's very

23     participatory in VA benefits, and he will continue to do that.

24              THE COURT:  Okay.  All right.  Thank you.

25          Mr. Witcher.

1          DEFENDANT WITCHER:  Yes, sir.  Would you like me

2     to -- would you like me to answer your question first, or would

3     you like me to just talk?

4          THE COURT:  Just tell me whatever you think I need to

5     know.

6          DEFENDANT WITCHER:  Well, you asked a question about

7     assaultive behavior, and I think I know exactly what you're

8     talking about.  I was arrested for domestic violence.  However,

9     there's a situation -- it was dismissed.  The DA went to the

10    grand jury and told them it needed to be dismissed.  And the

11    reason is I had prostate cancer at the time, and I was married

12    to my ex-wife at the time.  And I was 100 percent disabled.  I

13    had gone through a surgery on my foot to repair two tendons

14    that were ripped in the process of doing my job, and I was

15    undergoing at that point radiation treatment, which was

16    exhaustive, and I went home every day and just pretty much

17    passed out.

18         Once they started investigating and looking into this,

19    they realized that there was no way -- and doctors affirmed

20    it -- that there was no way I could do what they -- what I was

21    accused of doing that night.  Now, the question arises from

22    that:  Why would my ex-wife accuse me of that?  We've known

23    each other since we were 14 years old.  We went to school

24    together and everything.

25         The bottom line that's come out of this is that she --

1  we have -- we had tons of mutual friends throughout high school

2  and -- and here in Bastrop, and she didn't want to be the woman

3  who left the person with cancer.  She didn't want to be married

4  to a guy with cancer.  She thought I was dying.  She thought I

5  was terminally ill, and it looked pretty dicey there for a

6  little while.  It was pretty bad, prostate cancer.  She wanted

7  out, but she didn't want her friends to see that.  So she

8  accused me of that.  The medical end of the deal bore out that

9  it was completely impossible for me to have done what she

10 accused me of.  And the DA said, "I'm going to make sure that

11 this goes away," and he did.

12         THE COURT:  All right.  Tell me more about what I

13 should consider in sentencing you for what you did on

14 January 6th.

15         DEFENDANT WITCHER:  Okay, sir.  Basically, sir, I --

16 on January 6th, I went to Washington, D.C., and I made an

17 uncharacteristically bad decision.  By uncharacteristically, I

18 mean, I made my living making good and sound decisions that

19 were life and death and often had to make them on the spur of

20 the moment.

21     I am a passionate person, and I allowed my passion to be

22 interjected into the situation and cause me to make a bad

23 choice, and it was a bad choice to go in there.  And I've

24 thought about it.  I've had a year to think about it.  I've had

25 a year to reflect upon, you know, the -- the pain that it has

1    caused my family.  Every member -- every male member of my

2    family has served in the military, in the Marine Corps, and

3    most have saw combat.  And I cast a shadow and cast

4    embarrassment upon my family name and that legacy.  And I feel

5    like I let down my son.  I could have caused him some

6    embarrassment.  But he has stood by me.

7        And I feel like I -- I let down my countrymen, I let

8    down my fellow veterans, and I let down my wife, my grandson,

9    you know, who counts on me being there for him.

10       And I -- I wish I could take it back.  But I can't, but

11   I've always felt, Your Honor, that the real measure of a man is

12   not that he makes mistakes, because we all -- not mistakes.

13   That was not a mistake.  A mistake is writing -- misspelling a

14   word.  I made a really bad choice and a bad decision.

15       And I've always felt like the measure of a man when he

16   makes a bad decision is the actions that he takes in the

17   aftermath of it and the contrition that he shows for that

18   mistake and the -- and what he does to rectify that situation.

19       And once I got into that Capitol -- and Mr. Regan is

20   absolutely right.  I saw -- there was videos that he

21   referenced, and I am embarrassed with my behavior in there.  It

22   was not me, but -- but I did that.  Nobody else did it.  I did

23   it.  I did it of my own volition, and I regret that deeply.

24   It'll be a stain on my reputation and who I am as a man for the

25   remainder of my life.  I cannot take it back.

1       But what I did to rectify it, in the immediate, was that

2   I went to the aid of those police officers.  I looked at those

3   men and I was interacting with them.  At one point I was

4   yelling at them, but I began to interact with them.  One young

5   man told me, "I'm a veteran just like you."  And I said, "I

6   know you are, and I won't let anything happen to you."  I saw

7   it in their eyes.

8       It became, kind of, like my troops in war.  And I felt

9   like I had a duty, was incumbent upon me to help these young

10  men and women.  There were women there also.  And so at that

11  point, Mr. Barnard and I linked arms.  We spaced out more.  We

12  got these officers into -- behind us.  As people would pass, I

13  said, "Don't even look at these officers.  Don't even look at

14  these officers."

15      At one point, an officer named Juan Lopez came -- he

16  was -- some other people were out there bringing these young

17  officers in to try to keep them safe, and they saw what we were

18  doing over there, and they brought him to us.  Mr. Lopez looked

19  distraught.  He looked like a man who was very upset and

20  disappointed that he wasn't able to do his job.

21      And I looked at him at that point, and I said -- I said,

22  "Don't worry, Lopez."  I said, "You did the best you could do

23  out here.  You got overwhelmed."  I said, "Stay here with us."

24  I said, "We won't let anything happen to you."  And then at

25  some point, those officers were called to another place.  We

1     watched their back.  And then Mr. Barnard and I exited the

2     position.

3           The mitigating factors that I think that I would like to

4     be considered in this have very little to do with me.  They

5     have to do with -- I have a son who attends Texas Tech.  He

6     goes on my GI bill.  And that's seven hours from where I live,

7     and I need to go up there oftentimes because he's only 19, only

8     getting started.  So I go up there to help him out.

9           My -- my mother and my stepfather live about an hour and

10    a half from me.  They're both in their 80s, and my mom has

11    battled cancer.  And they're both, kind of, in declining

12    health.  And my brothers live out of state, and my sister has

13    suffered a stroke so she's unable to help out.  So I do go over

14    and help out, you know, my elderly parents.

15          My grandson lives right around the corner.  It's my

16    stepdaughter's son.  And I like to be there because I often

17    babysit him whenever he's not in his little Montessori school

18    or things like that.  We have a very close relationship.

19          And, you know, one of the things that really pains me is

20    that my son is my pride and joy.  You know, I've always often

21    said my job on this world is to get him to heaven, and I feel

22    like I let him down.  I feel like I embarrassed him, and I feel

23    like I potentially could have done something that harmed his

24    ability to get his education.

25          And my wife has been a tremendous support system for me

1    throughout this.  She's been very -- she wasn't happy with what

2    I did.  She wasn't -- but she stood by me and -- and I don't

3    want to let her down.

4         The one thing that I would like to address, other than

5    that -- and I think Mr. Regan was pretty spot on in his

6    assessment of my behavior that day.  I have very little to

7    argue with him on that.  But I will say this:  My military

8    service -- I think Mr. Regan is right.  I should have known

9    better.  I should have.  I'm a senior noncommissioned officer.

10   I'm a seasoned combat vet, and I've taken care of a lot of

11   young men.

12        I've worked as a -- a -- I worked in the child at-risk

13   youth field for a lot of years.  I've had a lot of good

14   influence on young men, but that day -- the only thing I will

15   say that reflected greatly upon my service is is that between

16   my parents raising of me and my brothers and my sister and

17   the -- and the military and the values that I learned in both

18   the Marine Corps and the Army, I think that's what made me

19   change the direction I was taking inside that Capitol that day

20   and go to the aid of police officers, because that is my true

21   nature.

22        I never meant any malice when I went in there.  I really

23   didn't.  I had no nefarious intent.  I'm a passionate man, and

24   I got caught up.  And shame on me for that, and I am

25   embarrassed of that, and I regret it greatly.  I regret the way

1    it reflected on the military.  I regret the way it reflected on

2    my fellow veterans, my countrymen, my family, my family's

3    military legacy.

4          But all I can do now is stand here today and take the

5    consequences of my actions, and I'm ready to do that.  I mean,

6    I believe that I have consequences coming, and I felt that from

7    day one; that there's a price to pay for bad choices and bad

8    decisions.  And really, Your Honor, that's all I've got to

9    stay.

10          THE COURT:  All right.  Thank you.

11          You know, what's particularly puzzling is, you know,

12   we're all -- all of us are doing a number of these cases, and a

13   lot of the folks in your position are like, I don't know what I

14   was thinking that day, I got caught up in the mob, and I just

15   followed the mob, which -- but when one looks at your record,

16   there's nothing in there but leadership, you know.  You

17   shouldn't have turned into a follower at that moment.  You

18   should have been the leader that you otherwise are.

19          DEFENDANT WITCHER:  May I speak and address that?

20          I completely agree with you, Your Honor.  It wasn't -- I

21   am -- I have been a leader all of my life.  I enjoy that

22   position in life, and you're right.  And I want to make sure

23   that I'm very clear; when I said I got caught up in the moment,

24   there is no one -- no one -- to blame for what I did except

25   myself.  I chose to go through that open door.  I chose to go

1    down that hallway.  I chose to address those law enforcement

2    officers.  And I -- I don't blame the mob.  I don't blame

3    anyone else.  The Capitol Police did not wave me in.  They did

4    not say, hey, it's okay.  I did not take a selfie with the

5    police officers.  The police officers I encountered were

6    frightened, and they were doing their duty.  And they weren't

7    welcoming, and I should have picked up on that sooner.  But

8    once I did, I changed my mind.

9         You are absolutely right, Your Honor, and that is one

10   thing that I did myself a great disservice in not standing up

11   earlier and saying we're not going in there, that's not the

12   correct thing to do.  And I wish I would have, but I didn't.

13   And that's why I feel like I pleaded guilty because I'm a man

14   who believes in accountability, and I -- I broke -- I broke the

15   law.  I went in there and I -- I did.  I broke the law and not

16   with malice and not with nefarious intent, but it's undeniable,

17   and I accept that responsibility.

18        THE COURT:  Okay.  All right.  As with Mr. Barnard,

19   I'll start with the financial matters.  The parties have agreed

20   on the $500 to the Architect of the Capitol for the

21   restitution.

22        There's a maximum fine in this case of 100,000 dollars

23   with a guidelines range of 500 to 9500 dollars.  Probation

24   indicated that the defendant has an ability to pay a fine, but

25   it did not recommend one, and I don't intend to impose one.

1    The defendant's on military disability, and I don't intend to

2    stretch that farther than it needs to go, especially with a

3    child with the expense of college.

4        All right.  The Court is to impose a sentence sufficient

5    but not greater than necessary, and I'm to consider the nature

6    and circumstances of the offense and the history and

7    characteristics of the defendant and assess the need to impose

8    a sentence that reflects the seriousness of the offense,

9    promotes respect for the law, and provide just punishment for

10   the offense.

11       I won't repeat everything I said earlier with respect to

12   Mr. Barnard about how serious I think the offense was and that

13   it was a violent event that resulted in a lot of damage.  But

14   as I indicated with Mr. Barnard, there's no evidence to

15   present -- has been presented that shows defendant assaulting

16   law enforcement or destroying property.  After entering the

17   Capitol Building through an entrance at which law enforcement

18   had been overwhelmed a short time beforehand, defendant entered

19   with his codefendant, made their way to the rotunda, and

20   remained inside for about 15 to 20 minutes.

21       The riot was successful, as I previously indicated, in

22   delaying the certification, in large part because of the

23   numbers of the participants involved, which simply overwhelmed

24   the outnumbered law enforcement officers present.  And the

25   defendant needs to be held accountable for his contribution to

1    that.

2         However, evidence has been presented that the

3    codefendants helped shield law enforcement officers in the

4    rotunda when the tenor of the interaction began turning

5    violent, much to his credit.  The defendant also attempted to

6    delete electronic evidence on his cell phone, although the FBI

7    was able to recover it; and subsequent to January 6th, he

8    voluntarily cooperated fully with the FBI, submitted to an

9    interview and search of his phone, and pleaded guilty at the

10   earliest opportunity.

11        Otherwise, defendant has no criminal history resulting

12   in points.  Defendant is a 59-year-old man, which just -- I

13   note you were born within two days of me.  So I think -- I read

14   somewhere that you climbed over a wall.  Is that you or -- no?

15             DEFENDANT WITCHER:  Climbed over a wall that day?

16             THE COURT:  Yeah.

17             DEFENDANT WITCHER:  Although I've climbed over many

18   walls, I don't recall --

19             (Indiscernible simultaneous cross-talk.)

20             THE COURT:  No. I may be -- there are a lot of

21   January 6th defendants.  I may have gotten you confused with

22   someone else.  I don't think I could get over a wall these

23   days.  So if you had --

24             DEFENDANT WITCHER:  I think our wall-climbing days

25   are over, Your Honor.

1          THE COURT:  You've got a high school education with

2     some recent college coursework.  Upon graduation from high

3     school, he entered the United States Marines and later the

4     Reserves, serving for about ten years from 1982 to 1993.

5     Remarkably, about ten years later, after working in a

6     therapeutic school for at-risk youth, he enlisted in the Army

7     and served another ten years from 2004 to 2014.

8          His lengthy service in the military included stints in

9     areas of imminent danger, including Egypt, Afghanistan, and

10    Iraq.  Unfortunately, this distinguished service came at a cost

11    that he now suffers from PTSD requiring medication, counseling.

12    Mr. Witcher is now retired from the military with 100 percent

13    disability.

14         Otherwise, his background is not particularly

15    remarkable.  His parents divorced when he was young, but

16    there's no indication that his material needs were not provided

17    for.  He describes his upbringing as normal and free from

18    abuse.  Mr. Witcher's married with a 19-year-old son from his

19    prior marriage and stepchildren from his current marriage.  He

20    appears to have a strong family support system in place.

21         The Court is to impose a sentence that affords adequate

22    deterrence to criminal conduct and protects the public from

23    further crimes of the defendant.  As I indicated, with respect

24    to Mr. Barnard, under these circumstances it's such a unique

25    event, I don't think you are likely to reoffend or be swept up

1    in irrational actions in the future.  I don't think you're a

2    risk to the public.

3            With respect to general deterrence, the Court does not

4    believe that incarceration or necessarily even home detention

5    is necessary to deter other nonviolent protesters from crossing

6    the line into lawbreaking.  The defendant's ordeal through the

7    criminal justice system, restitution, community service, and

8    probation should serve as an adequate deterrence to those that

9    can be deterred.

10           Given that he's already receiving services through the

11   VA, I don't intend to recommend mental health counseling as

12   part of his probation.  And that was the only education or

13   vocational training, medical care, or other correctional

14   treatment in the most effective manner that was suggested to

15   me.

16           I've considered the types of sentences involved, and

17   given the nature of the crime and the defendant's lack of

18   criminal history, the Court is considering a period of

19   probation.  I'm to consider the kinds of sentences and the

20   sentencing range established for the applicable category of

21   offense committed by the applicable category of defendant as

22   set forth in the guidelines.  The Court is cognizant that the

23   guidelines do not require any kind of incarceration or home

24   confinement.  No pertinent policy statements by the Sentencing

25   Commission have been brought to my attention.

1          I'm to impose a sentence that avoids unwarranted

2     sentencing disparities among defendants with similar records

3     who have been found guilty of similar conduct.  I already spoke

4     previously with respect to Mr. Barnard about the chart the

5     government has provided, but the Court -- that list doesn't

6     make it clear to the Court that the government has recommended

7     noncustodial or nonhome confinement probation sentences in the

8     past, and I find it hard to distinguish this case from those.

9     And the defendant's lengthy service to his country and efforts

10    to protect law enforcement in the rotunda makes any sort of

11    home confinement excessive.

12          We already dealt with the $500 of restitution.

13          I'll now indicate the sentence to be imposed, but

14    counsel will have one more opportunity to make any legal

15    objections before the sentence is actually imposed.

16          Mr. Bassett, do you have any objections to the factors

17    I've considered?

18               MR. BASSETT:  No, Your Honor.

19               THE COURT:  Mr. Regan?

20               MR. REGAN:  No, Your Honor.

21               THE COURT:  It is the judgment of the Court, that

22    you, Jeffrey Shane Witcher, are hereby sentenced to serve a

23    12-month term of probation on Count 2.  You are further ordered

24    to pay a special assessment of $25.  That's pursuant to statute

25    as to Count 5.  And then there's a $500 restitution paid to the

1      Architect of the Capitol.  Those things are paid -- made

2      payable to the Clerk of the Court.  And as I indicated with

3      respect to Mr. Barnard, within 30 days of any change of

4      address, you have to notify the court of that change until such

5      time as the financial obligations are paid in full.

6            While on supervision, you shall not use or possess an

7      illegal controlled substance, and you shall not commit another

8      federal, state, or local crime.  The mandatory drug testing

9      condition is suspended based on the Court's determination that

10     you pose a low risk of future substance abuse.

11           You shall abide by the general conditions of supervision

12     adopted by the U.S. Probation Office, as well as the following

13     special conditions:

14           As I indicated to Mr. Barnard, there's some financial

15     disclosure requirements in there, but if you pay up front, you

16     might not need to comply with any of that.  And then the

17     community service, you must complete 60 hours of community

18     service within 6 months.  The probation officer will supervise

19     the participation in the program by -- by approving the

20     program.

21           Mr. Bassett, any reason other than those previously

22     argued as to why I should not impose the sentence that's just

23     been stated?

24                MR. BASSETT:  No, Your Honor.

25                THE COURT:  Mr. Regan?

1          MR. REGAN:  No, Your Honor.

2          THE COURT REPORTER:  Sorry, Judge.  We didn't hear

3     that first sentence.

4          THE COURT:  I said I'll go ahead and do that, impose

5     the sentence I just stated.

6          I gather, Mr. Regan, that there's -- there are charges

7     to dismiss.  The defendant pleaded guilty to Count 2, and I

8     believe he's charged in 1, 3, 4, and 5.  Do those need to be

9     dismissed?

10          MR. REGAN:  They do, Your Honor.  The government

11     moves to dismiss those counts now.

12          THE COURT:  I'll go ahead and do that then.

13          All right.  Mr. Witcher, you were convicted by a plea of

14     guilty.  You can appeal your conviction if you believe that

15     your guilty plea was somehow involuntary or if there's some

16     other fundamental defect in the proceedings that was not waived

17     by your guilty plea.  As I indicated to Mr. Barnard, your plea

18     includes a pretty expansive waiver of appellate rights, but to

19     the extent you're considering appealing, you can talk to your

20     attorney about that.  You also might have a statutory right to

21     appeal under certain circumstances, and you can talk to your

22     attorney about those as well.

23          You have a right to -- if you're inclined to appeal, you

24     have a right to apply for leave to appeal in forma pauperis.

25     That means without payment of costs.  And if you so request and

1    qualify, the Clerk of the Court will prepare and file a notice

2    of appeal on your behalf, although I note that you're

3    represented by very able counsel who can assist you in that

4    process.  But with very few exceptions, any notice of appeal

5    must be filed within 14 days of the entry of the judgment.  As

6    I indicated to Mr. Barnard, it's not going to be docketed today

7    given that it's a Friday afternoon, but sometime early next

8    week it should be, and then you'll have 14 days from that point

9    to appeal.

10            Probation has been -- has asked me to transfer

11   jurisdiction to the Southern District of Texas.  Are the two

12   defendants in different districts?

13            THE PROBATION OFFICER:  Yes, Your Honor.  Mr. Witcher

14   resides in Bastrop, Texas, which is in the jurisdiction of the

15   Southern District of Texas.

16            THE COURT:  Okay.  Any objection to that transfer?

17            MR. BASSETT:  Yeah.  I think it's more convenient to

18   do the Western District, but -- is Bastrop in the Southern?

19            MR. SALINAS:  No, it's not.

20            MR. BASSETT:  I believe it should be the Western,

21   but --

22            THE COURT:  I looked on the map, and the two

23   defendants seem to live relatively close to each other, but --

24            MR. SALINAS:  We waive any objection to change it to

25   the Western District in ours, and I'm assuming that they didn't

1   make that correction on Mr. Witcher's.

2            MR. BASSETT:  I missed it, Judge.  If I can orally

3   request the Western District, it's a lot closer.  Austin.

4            THE COURT:  Ms. Gavito?

5            THE PROBATION OFFICER:  I'm double-checking,

6   Your Honor.  If I could have a minute.

7            MR. BASSETT:  He'll go wherever he needs to go.

8            MR. REGAN:  Your Honor, while that happens, obviously

9   no objection from the government on whichever district is

10  easier.  And just to confirm, that did not include a sentence

11  of home confinement; correct?

12           THE COURT:  That is correct.

13           MR. REGAN:  Thank you, Your Honor.

14           THE COURT:  I weighed the service to his country a

15  little bit differently than you did, ironically, given your

16  service.

17           DEFENDANT WITCHER:  I appreciate that, Your Honor.

18           MR. SALINAS:  And, Your Honor, since you're still on

19  the line, because Mr. Barnard was ordered for home confinement

20  and -- when is he supposed to start that?

21           THE COURT:  He should talk to his local probation

22  office.  I don't -- you know, whenever they can arrange for

23  that because he has to be fitted with the GPS and the like or

24  the monitoring, whatever.  So, you know, as soon -- at the

25  front end of his probation, but whenever they're able to do

1    that.

2            MR. SALINAS:  I didn't know, since Ms. Gavito is on

3    the line, if she needs to give him any further instructions,

4    but, you know, a lot of times they say within 72 hours or

5    5 days or whatever.

6            THE PROBATION OFFICER:  With regards to Mr. Witcher,

7    Your Honor, it is Western District of Texas.  I apologize for

8    that.

9            THE COURT:  Okay.  No problem.

10           THE PROBATION OFFICER:  And with regards to

11   contacting Mr. Barnard and Mr. Witcher to -- to discuss the

12   conditions of probation, I'll call them on the telephone later

13   on today or maybe even tomorrow morning.

14           THE COURT:  All right.  Anything else with either

15   defendant we have to deal with today?

16           MR. REGAN:  Nothing from the government, Your Honor.

17           MR. BASSETT:  No, Your Honor.

18           THE COURT:  Mr. Barnard and Mr. Witcher, I don't

19   expect I'll ever see you again, but good luck to you.

20           DEFENDANT WITCHER:  Thank you, Your Honor.

21           THE COURT:  All right.  Thank you.  You're excused.

22           (Proceedings were concluded at 3:57 p.m.)

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 20th day of February, 2022.

10

11                    /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25